**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Joseph FEEKES, Baltazar Lopez, and Juan Lopez, Defendants–Appellants.**

**Nos. 88–2552, 88–2631, 88–2676.**

United States Court of Appeals,
Seventh Circuit.

Argued April 19, 1989.

Decided July 20, 1989.

Rehearing Denied Aug. 9, 1989.

---

John W. Vaudreuil, Asst. U.S. Atty., Office of the U.S. Atty., Madison, Wis., for U.S.

Donald J. Murphy, Madison, Wis., for Feekes.

Robert S. Bailey, Chicago, Ill., for Baltazar Lopez.

Timothy Roberts, Madison, Wis., for Juan Lopez.

Before CUMMINGS, POSNER and KANNE, Circuit Judges.

CUMMINGS, Circuit Judge.

A jury convicted federal prison inmates Joseph Feekes and Baltazar Lopez, along with Lopez's son Juan, of conspiring to smuggle heroin into the prison and other related crimes. The district judge, believing the new federal sentencing guidelines to be unconstitutional, imposed sentences on the defendants ranging from seven years for Juan Lopez to 54 years for Baltazar Lopez, but also stated that if he were wrong about the unconstitutionality of the guidelines he would impose sentences under the guidelines ranging from 27 months for Juan Lopez to 22 years six months for Baltazar Lopez. Feekes and the Lopezes appeal their convictions and sentences. Since a full recitation of the facts is unnecessary to the issues raised by the appeals, we shall proceed directly to the issues.

### I. Alleged Outrageous Conduct by the Government

■ The first issue is whether the conviction of Feekes should be reversed because the government engaged in "outrageous conduct" while investigating him. See *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366; *United States v. Podolsky,* 798 F.2d 177 (7th Cir. 1986); *United States v. Valona,* 834 F.2d 1334 (7th Cir.1987).[1] Feekes' argument is intricate. He claimed at trial to have been entrapped into selling heroin by a government informant, a fellow inmate, but his entrapment defense was rejected by the jury. The claim of outrageous conduct centers on the government's failure to wire or otherwise monitor the informant when he solicited Feekes, and as a result essential evidence of entrapment—the evidence of what exactly the informant said to Feekes and what he replied—was unavailable.

This is certainly one of the few—if not the first—times a criminal defendant has complained about the government's *failure* to engage in electronic eavesdropping, and we are quite reluctant to hold that the government's failure to invade, or to invade enough, an individual's privacy during an investigation constitutes outrageous conduct.[2] Feekes' argument is premised on the unreliability of the informant in this case, on whose word the jury had to rely in the absence of monitored conversations. But this argument overlooks the obvious; it seems self-evident that informants are often an unsavory lot. The value of an informant stems from his opportunity to gain the confidence of participants in a criminal enterprise and glean information therefrom, an opportunity seldom available to ordinary, honest, law-abiding citizens.[3] Feekes' contention would require the government to utilize electronic eavesdropping devices every time an unsavory informant participates in an investigation.

---

**1.** In *Russell,* although the Supreme Court found the defendant predisposed to commit the crime for which he stood accused and thus rejected his defense that he was entrapped, the Court nonetheless noted that it might "some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." 411 U.S. at 431–432, 93 S.Ct. at 1643. While the possibility remains open, this Court has yet to reverse a conviction based only upon the outrageous conduct of the government within this specific context. See *Valona,* 834 F.2d at 1343; *United States v. Swiatek,* 819 F.2d 721, 725 (7th Cir.1987).

**2.** Our sympathies may well be aroused, and the analysis different, by an allegation that the government introduced selective conversations from a catalogue of conversations, or deliberately destroyed certain tapes or selectively taped or edited taped conversations, all of which might run afoul of the constitutional guarantee of due process, but here Feekes argues simply that the government did not tape any conversations and that it should have taped them all.

**3.** We of course recognize that this is not always the case, because honest citizens frequently step forward in the interests of their community.

The decision to employ electronic eavesdropping devices on the informant's person may well threaten the ultimate success of the investigation, as well as the safety of the informant, arising from the unplanned discovery of the listening apparatus by the subject of the investigation. Considering the setting and the nature of the suspected crime, see *Valona*, 834 F.2d at 1343, the decision not to employ electronic eavesdropping devices on an informant in prison is certainly not outrageous; the chance of discovery runs high and the consequences severe.

Finally, Feekes catalogues for this Court the reasons why the informant in this case was not to be trusted. But this information, rather than being argued in this Court, properly belonged before the jury, whose role is to reach credibility determinations. By convicting Feekes the jury manifested its belief in the truth of the informant's testimony, despite Feekes' argument to the contrary. Although a complete recorded catalogue of all the conversations between Feekes and the informant may have set the facts more definitively—here the jury believed it would have settled along the lines the government argues—in this instance the failure to do so is not necessarily outrageous. Rather Feekes had the opportunity, which he exploited, to attack the informant's credibility through cross-examination and other witnesses' testimony bearing on the informant's credibility.

II. Wiretapped Phone Conversations

■ The next issue, raised by the Lopezes, is a more conventional invocation of privacy. They argue that the introduction into evidence of tape recordings of the phone calls that Baltazar Lopez made from the prison to Juan Lopez outside the prison violated the federal wiretapping statute, 18 U.S.C. §§ 2510 *et seq.* The statute indeed forbids the use in evidence of wiretaps

made in violation of it, see 18 U.S.C. § 2515, but the government relies on two exceptions. Section 2510(5)(ii) excepts wiretapping "by an investigative or law enforcement officer in the ordinary course of his duties," that is, by "any officer of the United States or of a State or political subdivision thereof, who is empowered by law to conduct investigations...." 18 U.S.C. § 2510(7). And Section 2511(2)(c) allows wiretapping where "one of the parties to the communication has given prior consent to such interception." Taking the second of these exceptions first, we note that significant efforts were made to notify inmates that their telephone calls (other than to their lawyers) would be monitored, including signs in both English and Spanish to this effect which were posted within four to six inches of each phone; and while Baltazar Lopez claims to be illiterate in both languages, there was a good deal of evidence that he knew the phones were probably tapped.[4] The government argues that since Lopez knew the phones were tapped and used them anyway, he consented to their being tapped.

Although accepted in *United States v. Amen*, 831 F.2d 373, 378–379 (2d Cir.1987), on the basis of considerable case authority and some legislative history, this argument is troubling. To take a risk is not the same thing as to consent. The implication of the argument is that since wiretapping is known to be a widely employed investigative tool, anyone suspected of criminal (particularly drug) activity who uses a phone consents to have his phone tapped—particularly if he speaks in code, thereby manifesting an awareness of the risk.[5] Yet the more the government engages in wiretapping, the less protection people may have against illegal wiretapping.

■ Despite our apprehension about applying the second exception to the wiretapping statute to this case, the first exception is clearly satisfied. The regulations of the

4. Not only was there evidence that Baltazar wrote and received letters from family members while in prison, which suggests a modicum of literacy, but also there was evidence indicating that on occasion he spoke in code in the calls. Moreover, during orientation the inmates were

warned that their phone conversations would be recorded.

5. If anything the use of code indicates non-consent.

Bureau of Prisons authorized the tape recording of all prisoner calls except to prisoners' lawyers, and Baltazar Lopez's calls to his son were recorded in accordance with this routine, which was the "ordinary course" for the officers who supervised the monitoring system. See *United States v. Paul,* 614 F.2d 115, 116–117 (6th Cir.1980) (taping of prisoners' calls falls within law enforcement exception). The Lopezes do not argue that the prison should have obtained an intercept order (the equivalent of a search warrant) before tapping these calls. Their only argument is that Lieutenant Gunja, a prison investigator who reviewed the tapes of the Lopezes' conversations and used the information he gleaned from this review as part of his investigation of the Lopezes, violated the following regulation of the Bureau of Prisons: "When it appears likely that the incident may be subject to criminal prosecution, the investigating officer shall suspend the investigation," 28 C.F.R. § 541.14(b)(1). The idea behind the regulation is that at this point the matter should be turned over to the FBI or some other federal investigatory agency, rather than handled by prison staff members such as Lieutenant Gunja.

But even if Gunja had violated the regulation, it would not follow that the tape recordings should be excluded from evidence. The making of the tape recordings did not violate the wiretapping statute, the recordings were concededly done as part of a routine procedure, and we know of no other ground on which they could be excluded from evidence. The Lopezes' only complaint is that someone other than Gunja should have reviewed the tape after that point at which Gunja should have known that activity subject to criminal prosecution was being planned. Although the wiretapping statute itself requires exclusion of evidence obtained in violation of it, see 18 U.S.C. § 2515, and of course the Fourth and Fifth Amendments provide bases for exclusionary rules, there is no comparable counterpart for which to exclude this evidence on this basis.[6]

### III. Jury Deliberations

The next issue relates to the jury's deliberations and has two parts. One is whether the failure to give the jury a copy of Count I of the indictment was a reversible error. The jury was given a set of the instructions to take into the jury room, and page 23, which contained Count I (and nothing else), was inadvertently omitted.[7] However, all the instructions, including the thirteen counts of the indictment and the related elements, were read to the jury. And while the jury felt free to request other materials and ask questions, no request was ever made for the missing page. How the omission could have harmed the defendants escapes us. If any harm occurred, it likely affected the government's case, that is the danger that the jury will confuse accusation with proof and therefore not convict under the missing Count I. It is prosecutors, not defense counsel, who want the jury to have the indictment when it retires to deliberate. This omission was certainly harmless; it had no influence on the outcome of the case. See *United States v. Pirovolos,* 844 F.2d 415, 421 (7th Cir.1988).

The second and more substantial part of the issue, raised only by Baltazar Lopez, concerns the judge's handling of an impasse that occurred during the deliberations over that same Count I against this defendant. The jury retired to deliberate at 5:10 p.m. of the third day of trial, which was a Friday. At 2:45 a.m. it sent the judge a note asking, for the second time (the judge having declined to answer the question the first time and having told the jury to restudy the instructions), whether it was necessary that Baltazar Lopez have

---

**6.** The traditional basis for exclusionary rules, protection from unreasonable searches or police coercion, is not implicated here because the eavesdropping in issue, that is the routine recording of telephone conversations, did not unreasonably impinge upon Baltazar Lopez's privacy. Rather his only challenge is that the recordings should have been reviewed by a law enforcement officer other than Gunja.

**7.** At least it was unaccounted for after the deliberations. As the government points out, it is conceivable that the page was lost in the jury room.

known that heroin was going to be brought into the prison or whether it was enough that he knew that heroin would be procured as part of the conspiracy charged against all defendants in Count I. The note also informed the judge that the jury was divided eleven to one for conviction on the count—the one being, naturally, the juror who thought proof of such knowledge by Baltazar Lopez was necessary. The judge, without answering the question, brought the jury back into the courtroom and told them that if they preferred, they could adjourn for the remainder of the night and reconvene at 11:00 a.m. the next morning. They returned to the jury room and at 3:30 sent out a rather melodramatic note stating, "We will stay until a decision or death, whichever comes first. We await your decision [on adjournment] but are still trying to convince the juror. It is our hope that your answer [to the twice-previously-repeated question] will also convince her." The judge brought the jury back into the courtroom (it was now 3:50 a.m.) and told them "the unlawful purpose is this agreement to distribute and to possess with intent to distribute heroin." The jury retired once again, and ten minutes later returned with its verdict, convicting both Lopezes on Count I as well as Feekes and Baltazar Lopez on all the remaining counts against them.[8]

The question is whether the circumstances, including the lateness of the hour and consequent deprivation of sleep as well as the revelation that a single juror was holding out as to Baltazar Lopez on Count I, operated to coerce that juror into voting to convict him. If his counsel had asked for adjournment and the judge had refused, we would reverse, for certainly the hold-out was placed in an uncomfortable position by the 3:30 a.m. determination of the other jurors to reach a unanimous verdict or die trying. But Baltazar Lopez's counsel did not request an adjournment. It is certainly not uncommon for jurors to want to complete their deliberations if at all possible on the day they begin—especially if it is Fri-

day—even if that means staying up all night. Baltazar Lopez's lawyer may well have believed (and his failure to object is demonstrative) that his client's better chance for an acquittal or more realistically a hung jury was to allow the jury to continue deliberating, in the hope that the majority would tire before the hold-out juror.

There are of course limits to the power of lawyers to agree, even with the consent of the trial judge, to bizarre procedures for the determination of guilt and innocence in federal trials. We tolerate neither randomness nor extremism, not simply because a certain minimum of civilized procedure is deemed essential to the dignity of the federal courts, but because of the rights that inure to each criminal defendant from the conveniently vague term "due process of law." See *Walberg v. Israel,* 766 F.2d 1071 (7th Cir.1985). But conviction by a jury that stays up all night in an effort to reach unanimity is nonetheless deliberative, not necessarily irrational, and its judgment should not be overturned solely on the basis of conjecture concerning the effect on a dissenting juror without even the slightest indication that she would have preferred to adjourn. This is particularly so in the absence of an objection from any defense counsel, indicating that the defense was amenable to continuing without adjournment for strategic purposes. The judge's 3:50 a.m. final clarification may have made clear to the hold-out juror at last that Baltazar Lopez didn't have to know that the heroin would be brought back into the prison—it was enough that he knew that heroin would be procured. His role in the conspiracy was to obtain heroin from outside the prison for Feekes, rather than to distribute it within the prison.

It no doubt would have been preferable for the judge to have adjourned the jury's deliberations at a reasonable hour and require them to come back the next day as he himself preferred by 2:45 a.m., for most people are not at their mental best at 4:00 a.m. when the verdicts were returned. But

---

**8.** Feekes was acquitted on Count I and two other defendants not before this Court were

acquitted on all counts.

we do not think the judge's handling of the matter was so egregious as to warrant reversal in the face of what may well have been a tactical decision by defendant and his counsel to keep the jury deliberating as it wished according to its 3:30 a.m. note to the judge.

### IV. Sentencing

 The final issue is the appropriateness of sentencing. The district judge, of the opinion that the new federal sentencing guidelines were unconstitutional, imposed sentences without regard to the guidelines. If the guidelines were found constitutional, however, he announced an alternative sentence which conformed with the guidelines. Later the Supreme Court did of course hold the guidelines constitutional, see *Mistretta v. United States*, — U.S. —, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989), but the government argues that the only consequence is that the guideline sentences that the district judge "alternatively ... imposed" sprang into effect. This is incorrect. The district judge did not impose alternative sentences. He merely announced the sentences he *would* impose if his ruling concerning the unconstitutionality of the guidelines was overturned. We therefore must vacate Feekes' sentence and remand for resentencing. See *United States v. Agyemang*, 876 F.2d 1264, 1269–70 (7th Cir.1989).

The convictions are affirmed, but the sentences are vacated with directions to resentence these three defendants.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH DIRECTIONS.