**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 21 1997**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JAMES T. KALYVAS,
MULK RAJ DASS,

Defendants-Appellants.

No. 96-5144
No. 96-5176
(D.C. No. 95-CR-54-K)
(Northern District of Oklahoma)

**ORDER AND JUDGMENT**[*]

Before **LUCERO,** Circuit Judge, **MURPHY**, Circuit Judge, and **MCWILLIAMS**, Senior Circuit Judge.

No. 96-5144, United States v. Kalyvas, was orally argued before this panel on May 12, 1997. In 96-5176, United States v. Dass, counsel waived oral argument. Accordingly, the two cases have been companioned for purposes of appeal.

By superseding indictment, James T. Kalyvas ("Kalyvas") and Mulk Raj Dass ("Dass") were charged in the first count with conspiracy to defraud (18 U.S.C. § 371) and

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3

in four succeeding counts with wire fraud (18 U.S.C. §§ 1343 and 2(b)).  A jury acquitted Kalyvas on the first four counts of the indictment, but convicted him on Count 5 of the indictment.  He was sentenced to 18 months imprisonment.  Dass was convicted on all five counts of the indictment and was sentenced to 37 months imprisonment, three years of supervised release, restitution in the amount of $25,000 and a special assessment of $250.   Both appealed their respective convictions.

Count 1 of the superseding indictment charged Kalyvas and Dass with conspiring from June 1, 1993, to June 1, 1994, to commit offenses against the United States in violation of 18 U.S.C. § 371.  Specifically, they were charged with conspiring to transmit by means of wire communications in interstate commerce certain writings for the purpose of executing a scheme to defraud Ronald Kirkpatrick ("Kirkpatrick"), and others doing business as Oklahoma Feldspar Corporation ("Feldspar"), in violation of 18 U.S.C. §§ 1343 and 2(b).  The "Means and Methods" used by the two defendants were set forth in the superceding indictment in detail, and the "Overt Acts" of the two were also spelled out in detail.

In Count 2 of the superseding indictment, the scheme to defraud was set forth with even greater particularity and concluded by charging Kalyvas and Dass with transmitting, in furtherance of their scheme to defraud, on August 17, 1993, by wire from Sarasota, Florida, to Tulsa, Oklahoma, a document entitled "Contingent Consulting Agreement" for the signature of Kirkpatrick, in violation of 18 U.S.C. §§ 1343 and 2(b).  Paragraph J of

Count 2 in the superseding indictment stated that a part of the scheme to defraud was that the defendants would conceal from Kirkpatrick "Dass' involvement in similar schemes in the past."[1]

Count 3 of the superseding indictment charged the defendants with transmitting by wire on August 17, 1993, from the First City Bank in Tulsa, Oklahoma, to the trust account of Kalyvas at Barnett Bank of Southwest Florida, Sarasota, Florida, a $100,000 wire money transfer in furtherance of their scheme to defraud and in violation of 18 U.S.C. §§ 1343 and 2(b).

Count 4 of the superseding indictment charged the defendants with transmitting by wire on September 16, 1993, from Sarasota, Florida, to Tulsa, Oklahoma, an "extension agreement" to the aforesaid "Contingent Consulting Agreement," dated August 17, 1993, extending the defendants' time for performance until September 27, 1993, in furtherance of their scheme to defraud and in violation of 18 U.S.C. §§ 1343 and 2(b).

Count 5 of the superseding indictment charged the defendants with transmitting by wire on December 1, 1993, from Sarasota, Florida, to Tulsa, Oklahoma, a "Further Amendment to Contingent Consulting Agreement," increasing the amount of the

---

[1]Paragraph J of the second count in the original indictment charged that a part of the scheme to defraud was that the defendants would conceal from Kirkpatrick the fact that Dass had been convicted of fraud in a federal district court in Camden, New Jersey, and had only been released from prison in Texas a short time prior to Dass' first contact with Kirkpatrick. As indicated, this particular allegation was not in the superseding indictment.

"guarantee bond" and extending the defendants' time for performance to January 6, 1994, in furtherance of their scheme to defraud and in violation of 18 U.S.C. §§ 1343 and 2(b).

Some background information will help to place the issues raised on appeal in focus. In 1992, Kalyvas, an Oklahoma attorney, received a telephone call from a Dr. Dass, described by some as an international businessman and banker. Several years prior to this call, Kalyvas apparently had a "chance meeting" with Dass in London, England. Dass' call to Kalyvas in 1992 was made from a jail in New Jersey, Dass then having been recently convicted in a federal court in New Jersey of fraud. The purpose of the call was to enlist Kalyvas' aid in perfecting Dass' appeal. Kalyvas explained that he did not, himself, practice criminal law, but Kalyvas agreed to help Dass obtain an attorney to represent him on appeal. Kalyvas apparently did, however, review parts of Dass' trial record and formed the opinion that the conviction might be "suspect."

In ensuing telephone conversations with Kalyvas, Dass told him that he had numerous pending business transactions with which he needed the legal and business assistance of Kalyvas. After making a limited background check, Kalyvas agreed to work for Dass as his "trustee and attorney."

Shifting gears, Feldspar was formed by Kirkpatrick for the purpose of mining feldspar for making glass. The company was in dire financial straights, having spent hundreds of thousands of dollars of its investors' money with no return thereon. The

investors were threatening litigation, and Kirkpatrick thought he needed at least $2,000,000 to get the business on its feet.

One of the investors in Feldspar was a Ms. Leah Rich, who was apparently well acquainted with a Ms. Pat Runyon, the city manager for Waurika, Oklahoma. Runyon had contact with Dass at about this time, or shortly prior thereto, when Dass was assisting the city in raising capital to construct a private jail facility. Because both Rich and Runyon were impressed with Dass' business acumen and his apparent access to "big money," they suggested to Kirkpatrick that he contact Dass to see if the latter could help Feldspar obtain adequate financing, which Kirkpatrick proceeded to do.

Thereafter, negotiations between Kirkpatrick and Dass occurred, with the latter being represented at all times by Kalyvas. These negotiations culminated in an agreement between Feldspar and Dass whereby Dass agreed to assist Feldspar in obtaining "a financial guarantee bond" from an insurance company which would serve as collateral for Feldspar's prospective investors. Dass, acting through his "trustee and attorney," Kalyvas, had also represented that he knew many potential investors for Feldspar. The "Contingent Consulting Agreement" to that general effect was sent by Kalyvas from Florida to Kirkpatrick in Oklahoma on August 17, 1993. Pursuant to the agreement, Kirkpatrick then sent the sum of $100,000 from Oklahoma by wire to Kalyvas' trustee account in Florida. It was the understanding that $90,000 would be used to purchase the "guarantee bond," and the remaining $10,000 was a "non-refundable" fee for Dass and,

or, Kalyvas. It was further agreed that, if a "guarantee bond" could not be obtained, the $90,000 would be promptly returned to Feldspar.

Within days after Kirkpatrick deposited the $100,000 into Kalyvas' trustee account in Florida, Kalyvas caused virtually the entire $100,000 to be withdrawn from the account, most of which was then spent by Kalyvas for his personal expenses, with a small part thereof going to Dass. Needless to say, no "guarantee bond" was ever obtained, nor was the $90,000 ever returned to Feldspar, even though several requests for extension of time within which to obtain the "guarantee bond" or return the $90,000 were made. So much for the background facts.

KALYVAS

In his initial conversation with Kirkpatrick, Kalyvas "vouched" for Dass in only general terms, stating, in effect, that Dass was a well known and respected international businessman and banker and that he had engaged in several deals similar to the one eventually entered into between Feldspar and Dass. Kalyvas did not tell Kirkpatrick that Dass had been convicted for wire fraud in New Jersey and had been only recently released from prison. Kalyvas' initial and perhaps principal argument in this court is that since he was under no legal duty to tell Kirkpatrick that Dass had a prior criminal conviction, any omission on his part to so tell cannot be the predicate upon which a scheme to defraud could be based. In thus arguing, counsel relies on *Chiarella v. United*

*States,* 445 U.S. 222 (1980) and *United States v. Irwin,* 654 F.2d 671 (10th Cir. 1981), *cert. denied*, 455 U.S. 1016 (1982), neither of which, in our view, dictates a reversal in the present case.

Kalyvas was <u>not</u> charged with willfully concealing from Kirkpatrick the fact that Dass had a prior felony conviction. As indicated in Count 1, Kalyvas and Dass were charged with conspiring to use interstate wire communications in executing and furthering a scheme to defraud Kirkpatrick and Feldspar, and in Counts, 2, 3, 4, and 5 they were charged as principals, and as aiders and abettors, with using interstate wire communications to carry out and execute their scheme to defraud Kirkpatrick and Feldspar..

Specifically, in Count 5, the only count Kalyvas was convicted of by the jury, he was charged with transmitting, or aiding and abetting in the transmission, by wire on December 1, 1993, from Florida to Oklahoma a proposed extension of time for Dass to perform, all of which was allegedly in furtherance of their original scheme to defraud. The instructions did not instruct the jury that an essential element of the crime charged in Count 5 was that Kalyvas intentionally concealed from Kirkpatrick the fact that Dass had a prior felony conviction. Such, of course, was <u>not</u> an essential element of the crime charged in Count 5.

In this regard, the jury was instructed that as to Counts 2, 3, 4, and 5, the essential elements were as follows:

Three essential elements are required to be proved in order to establish the offense charged in Counts 2 through 5 of the indictment:

First: That there was a scheme or artifice to defraud or to obtain money or property by false and fraudulent pretenses, representations or promises, as alleged in the indictment;

Second: That the defendant knowingly and willfully participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud; and

Third: That in execution or in furtherance of that scheme, the use of the interstate wires occurred as specified in the indictment.

The unlawful offense is complete when the three separate elements, just stated, are proved beyond a reasonable doubt. Unless the government proves beyond a reasonable doubt that every element of an offense with which a defendant has been charged has been committed, you must find that defendant not guilty.

Certainly the evidence showed, *prima facie*, that Kalyvas and Dass, knowingly and willfully, participated in a scheme to defraud Kirkpatrick and Feldspar of $100,000 and that, in so doing, they used interstate wire communication. Kalyvas, acting for Dass, received $100,000 from Kirkpatrick in return for which Dass was to obtain a so-called "guarantee bond," for Kirkpatrick and Feldspar. In obtaining such bond, Dass would use $90,000, with the remaining $10,000 to be a non-refundable fee for Kalyvas and Dass. The agreement went on to provide that if no guarantee bond could be obtained, the $90,000 would be promptly returned to Kirkpatrick. Within days after the $100,000 was placed by Kirkpatrick in Kalyvas' trustee account in Florida, virtually the entire $100,000

- 8 -

was withdrawn by Kalyvas and used for personal purposes by himself and Dass. No guarantee bond was ever obtained and no part of the $100,000 was ever returned. Such, to us, is a classic case of a scheme to defraud.

We do not need to be here concerned with whether Kalyvas had any "duty" to disclose to Kirkpatrick the criminal history of Dass. A failure to thus disclose was not an essential element of Count 5, and the fact that he may have had no duty to thus disclose does not preclude his conviction on Count 5. Testimony as to what Kalyvas told Kirkpatrick in their conversations leading up to Kirkpatrick's giving Kalyvas $100,000 for delivery to Kalyvas' trustee account for Dass was of course admissible evidence. And what Kalyvas did <u>not</u> tell Kirkpatrick about Dass' background is arguably evidence of an intent to defraud, even though such was not an essential element of any count of the indictment.

Counsel next argues that the evidence is legally insufficient to sustain Kalyvas' conviction on Count 5, stating that "well established judicial precedent removes routine communications of attorneys from the scope of mail and wire fraud statutes when the attorney is not a principal to the transaction in question, the communication is sent within the scope of the representation and the communication contains no inherent falsehoods or misstatements of fact." This argument misses the mark.

The government's evidence established, *prima facie*, that Kalyvas used an interstate wire communication on August 17, 1993 to effectuate a "Contingent Consulting

Agreement" between Kirkpatrick and Dass. Pursuant to that agreement, it is agreed that Kirkpatrick transmitted by wire $100,000 from Oklahoma to Kalyvas' trustee account in Florida on August 17, 1993. And the very damning fact is that within days thereafter, Kalyvas withdrew virtually the entire $100,000 which was spent for personal use by Kalyvas and Dass, and not for the purposes contemplated by the "Contingent Consulting Agreement." Kalyvas' use of the interstate wire communication alleged in Counts 4 and 5 seeking extensions of time within which to obtain a "guarantee bond" or return the $90,000 were obviously for the purpose of concealing the fact that not only had they failed to obtain a "guarantee bond," but, more importantly, there no longer was $90,000 with which to obtain such a bond. The purpose of these extension requests was to further the fraud by concealing the fact that the $100,000 had long ago been converted to the defendants' personal use. In sum, the evidence supports Kalyvas' conviction on Count 5.

As indicated, Kalyvas was convicted on Count 5 only, and was acquitted on Counts 1, 2, 3, and 4. Counsel suggests that the jury's verdicts are legally inconsistent to the end that Kalyvas' conviction on Count 5 must be vacated and set aside. In thus arguing, counsel states that he is not "unmindful" of the Supreme Court's pronouncements in *United States v. Powell*, 469 U.S. 57 (1984) and *Dunn v. United States*, 284 U.S. 390 (1932), but argues that the instant case is distinguishable from those cases. We think not.

In *Dunn*, the defendant was charged on a first count with maintaining a common nuisance by keeping for sale at a specified place intoxicating liquor, in a second count with the unlawful possession of intoxicating liquor, and in a third count with the unlawful sale of such liquor. The Supreme Court characterized the evidence adduced at trial as being "the same for all the counts." *Dunn*, 284 U.S. at 392. A jury convicted Dunn on Count 1 but acquitted him on Counts 2 and 3. In rejecting Dunn's argument that the three verdicts were legally inconsistent, the Supreme Court, speaking through Justice Holmes, held that "[c]onsistency in the verdict is not necessary" and noted that the "verdict may have been the result of compromise, or of a mistake on the part of the jury. . .," and then added that "verdicts cannot be upset by speculation or inquiry into such matters." *Dunn*, 284 U.S. at 393-94.

In *Powell*, the defendant was acquitted of conspiring to possess cocaine with intent to distribute and possession with intent to distribute cocaine but convicted on three counts charging her with using an interstate telephone call to facilitate the conspiracy to possess with intent to distribute and possession with intent to distribute cocaine. The Supreme Court in *Powell* followed *Dunn* and refused to create an exception thereto where the jury acquitted a defendant on a predicate felony, but convicts on the compound felony. In so doing, the Court spoke as follows:

> The rule that the defendant may not upset such a verdict
> embodies a prudent acknowledgment of a number of factors.
> First, as the above quote suggests, inconsistent verdicts-even
> verdicts that acquit on a predicate offense while convicting on

the compound offense-should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense. But in such situations the Government has no recourse if it wishes to correct the jury's error; the Government is precluded from appealing or otherwise upsetting such an acquittal by the Constitution's Double Jeopardy Clause.[2] (Citations omitted).

*Powell,* 469 U.S. at 65.

In this general regard we note that Kalyvas is wheelchair bound because of multiple sclerosis, and in acquitting him on Counts 1 through 4, the jury could understandably have been influenced by lenity.

Counsel also asserts that the district court erred in denying Kalyvas' motion to sever his trial from Dass' trial. This is particularly true, says counsel, because of the extensive evidence of "other transactions" which, under Fed. R. Evid. 404(b) was admissible, even though Kalyvas himself was not involved in all the "other transactions." In this latter regard, Kalyvas was involved in many of the "other transactions," though admittedly, not all.

Be that as it may, we find no abuse of discretion by the district court in denying the motion for a severance. Persons jointly indicted are generally to be tried together and a

---

[2]In *United States v. Morehead*, 959 F.2d 1489, 1503 (10th Cir. 1992), we recognized the Supreme Court's holding in *Powell* "that an inconsistent verdict is not a basis for reversal."

defendant has a considerable burden to demonstrate prejudice stemming from a joint trial. *See Zafiro v. United States*, 506 U.S. 534 (1993) and *United States v. Edwards,* 69 F.3d 419, 434 (10th Cir. 1995), *cert. denied,* 116 S.Ct. 2497 (1996). Here, Kalyvas and Dass were operating "hand in glove," so to speak, in their dealings with Kirkpatrick, all of which suggests a joint trial. In sum, we find no abuse of discretion on the part of the trial court in denying Kalyvas' motion for a severance.

The remaining matters urged by counsel in his brief as grounds for reversal, though not pursued at oral argument, have been considered and in our view none warrants a reversal. Accordingly, Kalyvas' conviction and sentence are affirmed.

## DASS[3]

Not surprisingly, Dass' statement of the facts differs from Kalyvas' statement of the facts. All of which, however, is of little consequence, since on appeal Dass does not in any way challenge the sufficiency of the evidence to support his five convictions.

In this court, Dass' initial argument is that the district court erred in admitting into evidence at trial tape recordings of telephone conversations he had with Kalyvas when he, Dass, was incarcerated at a penal institution in Texas. Counsel argues that Title III of the

---

[3]On this appeal, Dass is represented by the Federal Public Defender's office for the State of Colorado. After briefing, Dass filed a motion to be allowed to file a supplemental pro se brief. That motion is denied, without prejudice to his being permitted to file a pro se petition for rehearing, if he be so inclined.

Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510-21 generally forbids recording of wire, oral or electronic communications, including telephone conversations, without a warrant. However, counsel concedes that Title III does not apply to prisoners' conversations on institutional telephones when the inmate has knowledge and consents, impliedly or expressly, that his calls may be monitored, or when such monitoring constitutes "law enforcement acting in the 'ordinary course of duties'." In the instant case, after hearing, the district court denied Dass' motion to suppress the use at trial of the recordings of his telephone conversations with Kalyvas, holding that Dass had at least impliedly consented to having his telephone conversations monitored and recorded, and, alternatively, that such fell within the "law enforcement" exception to Title III. We are not inclined to disturb that ruling.

The penal institution wherein Dass was then confined gave all inmates notice that personal calls of this sort could be monitored and recorded. On appeal, counsel does not really challenge the district court's holding that Dass consented to the monitoring of his calls, and argues only that the consent exception to Title III should not apply because the monitoring was not "random." With this we do not agree. Indeed, it would appear that the initial monitoring of Dass' calls was random, but that, when suspicions were aroused by the frequency and nature of the calls, the monitoring understandably escalated. The district court did not err in denying Dass' motion to suppress the use at trial of his telephone conversations with Kalyvas. *See United States v. Feekes,* 879 F.2d 1562, 1565

- 14 -

(7th Cir. 1989), *United States v. Amen,* 831 F.2d 373, 379 (2nd Cir. 1987), *cert. denied,* 485 U.S. 1021 (1988), and *United States v. Paul,* 614 F.2d 115 (6th Cir. 1980), *cert. denied*, 446 U.S. 941 (1980).[4]

Dass next argues that the district court erred in admitting into evidence testimony concerning "other transactions" under Fed. R. Evid. 404(b). We find no error in this regard. The other transactions were similar to the transaction here involved, i.e., an "advance fee" to purchase a "guarantee bond." Certainly the "other transactions" tended to show intent, and state of mind, and the jury was so instructed.

Counsel next argues that the sentence imposed by the district court should be vacated because Dass was not given his right of allocution prior to sentencing, as required by Fed. R. Crim. P. 32(c)(3)(C), nor did the district court make any finding as to Dass' ability to make restitution, and for the further reason that Dass was orally ordered to make restitution in the amount of $25,000, whereas the formal written judgment provided for restitution in the amount of $75,000.

It is apparently agreed that Dass was not afforded an opportunity to allocute before being sentenced. In *United States v. Gardner,* 480 F.2d 929 (10th Cir. 1973), *cert. denied*, 414 U.S. 977 (1973), we held that the failure of a district court to follow Rule 32 can be raised on direct appeal, and that "such failure" is error. *See also, United States v.*

---

[4]We are not here concerned with the monitoring of telephone conversations between a prison inmate and his attorney in a true attorney-client relationship.

*Archer,* 70 F.3d 1149, 1151 (10th Cir. 1995) and *United States v. Muniz,* 1 F.3d 1018, 1025 (10th Cir. 1993), *cert. denied*, 510 U.S. 1002 (1993).  In our case, the district court simply did not comply with Fed. R. Civ. P. 32(c)(3)(C) before imposing sentence.  The fact that after sentencing Dass may have indicated to counsel that he did not wish to make any statement to the district court before being sentenced does not excuse the district court's non-compliance with the rule.  Dass' motion to strike counsel's affidavit in appellee's appendix is, however, denied.  Therefore the entire sentence imposed by the district court is vacated and the case is remanded for resentencing.  Dass' other challenges to his sentence may be urged at resentencing.  Dass' convictions, however, are hereby affirmed.

ENTERED FOR THE COURT

Robert H. McWilliams
Senior Circuit Judge