**Aaron PACKER, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 71A03–0212–CR–432.

Court of Appeals of Indiana.

Nov. 19, 2003.

Transfer Denied Feb. 20, 2004.

John Pinnow, Greenwood, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Christopher C.T. Stephen, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SHARPNACK, Judge.

Aaron Packer appeals his conviction for murder, a felony.[1] Packer raises one issue, which we restate as whether the trial court abused its discretion by admitting the tapes of pretrial conversations he had with his girlfriend during telephone calls from jail. We affirm.

The relevant facts follow. On January 25, 2002, at approximately 7:45 a.m., Ronald Hernton left his apartment to go to work. On his way out of the Courtyard Place Apartment Complex, Hernton overheard a man, subsequently identified as Packer, and a woman, subsequently identified as Christie Clark, arguing. According to Hernton, Packer was telling the woman that he did not want her to see any other men. In particular, Packer did not want Clark to see the man she was currently dating. Clark responded that because they were not going together he could not do anything about the man she was dating. Packer replied, "Oh, I can do something about it . . . if I catch you with him, I am going to kill him." Transcript at 193. The man that Clark was dating was later identified as the victim, Terry Bailey.

Later that day, at approximately 2:30 p.m., Scott Chya, a maintenance man for the Courtyard Place Apartments, was repairing the roof of Building 2. Chya testified that he saw Packer stab the tires of

---

1. Ind.Code § 35–42–1–1(1)(Supp.2002).

the driver's side of a blue car with a screwdriver and vandalize the inside of the car. He then watched as Packer entered a black car, pulled it forward, and parked it in a parking spot near Building 1. Chya climbed down from the roof, wrote down the license plate number of Packer's car, and went up to the main office in order to have the leasing agent call the police. Chya went back to the maintenance shop and waited for the police to arrive. When the police arrived, Chya reported the vandalizing of the car by Packer. Chya also told the police that Packer lived at 413 South 25th Street, Apartment 1C. The license plate on the vandalized car was registered to Clark at the same address. Officer Kronewitter went to 413 South 25th Street, Apartment 1C and knocked on the door, but no one answered. Chya returned to his work on the roof and later saw Packer return and remove the speakers from the vandalized car.

Layla Davidovich also lived in the Courtyard Place Apartments. Davidovich lived at 412 South 25th Street, Apartment A2 with her son that she had with Bailey. On January 25, 2002, Bailey came to visit his son at around 1:30 p.m. Davidovich and Bailey argued about the blue car he was driving. Davidovich had heard that the blue car belonged to Clark, but when she confronted Bailey about it, he said the blue car belonged to one of his friends. Bailey left Davidovich's apartment at around 4:30 p.m.

Bailey returned to Davidovich's apartment because the tires on the blue car had been slashed and the steering column had been cracked. Bailey told Davidovich that he was going to call the police about the vandalizing of the blue car. Bailey suspected that Packer had vandalized the blue car. Davidovich gave Bailey a piece of paper and a pen so he could get Packer's address. The paper was white and was torn off of an envelope. The pen had green ink.

At 4:51 p.m., Sergeant Scott Hanley of the South Bend Police Department received a dispatch that there had been a shooting at the Courtyard Place Apartments. Sergeant Hanley arrived and found Bailey dead from twelve gunshot wounds. Bailey was lying in the grass between two apartment buildings and near the windows of Packer and Clark's apartment. There were 9mm cartridge casings spread out on the ground, including some by the windows of Packer's and Clark's apartment. All of the cartridge casings were each identified as having been fired from the same firearm. A piece of paper with Packer's and Clark's apartment number written on it was found in Bailey's hand. "413 AptC1" was written in green ink on the paper. State's Exhibit 10. The police went to 413 South 25th Street, Apartment 1C, but no one answered the door and no one was found inside upon the execution of a search warrant.

Later that afternoon, Packer and Clark showed up at Daniel Hooker's house. Packer asked to use the phone. Packer looked nervous, and his cheeks were red. Packer told Hooker that someone tried to kick in his door and that he climbed out the bathroom window. Clark was fidgety and looked like she was crying. Clark told Casie Carter, Hooker's girlfriend, that someone had kicked in her front door and that Packer went out the back window. Clark also told Carter that another person had been shooting and that Packer shot back.

Packer called Joseph Copeland and asked him for a ride to K–Mart. Copeland picked up Packer and Clark at Hooker's house and took them to K–Mart. Both Packer and Clark were nervous and quiet during the drive to K–Mart. The week before Packer called Copeland for a ride,

Copeland saw Packer with a chrome and black gun.

Packer and Clark later met Clark's sister, Cheryl Clark, and her fiancé at K–Mart and went to their house. Cheryl testified that when they were sitting together in the living room Clark said, "Aaron [Packer] shot Terry [Bailey]." Transcript at 536. Cheryl further testified that no one said that this statement was untrue. Clark also told Cheryl that Bailey had come up the steps into the courtyard toward Packer and that he had pulled up his shirt like he had a gun.

Sergeant Randy Kaps looked for Packer for two months. Eventually, Sergeant Kaps received a tip that Packer was hiding out at his girlfriend's house. On March 25, 2002, Clark allowed the police to search her home. Packer was found hiding inside a cabinet and was arrested. Packer was charged with murder, a felony, and being a habitual offender.[2] Clark was charged with assisting a criminal as a class D felony.[3]

When incarcerated, Packer and Clark each received an inmate handbook at the St. Joseph County Jail. Both Packer and Clark signed the St. Joseph County Jail Initial Classification Screening Form. The St. Joseph County Jail Initial Classification Screening Form stated that they received the St. Joseph County Jail Handbook and understood its contents. Packer and Clark did not have to read the entire handbook before acknowledging that they received a copy of it. A rule in the handbook stated that all telephone calls from inmates at the jail were subject to being recorded and monitored. The St. Joseph

County Jail had installed the system to record every telephone call, in part, to aid criminal investigations. When a telephone call was made from the St. Joseph County Jail, an announcement played informing the parties that the telephone call was from a correctional institution and that the telephone call was subject to being recorded and monitored. Packer showed awareness of the system in a telephone conversation with Clark. Specifically, Packer said, "It's hard to tell when they're recording these phone calls." Exhibit 98A at 1.

After Clark's release from jail, Packer called Clark on several occasions from jail. During these telephone calls, Packer and Clark discussed their cases. Packer instructed Clark to tell the investigators that Copeland had been fighting with Bailey and that Copeland had shot him. Specifically, on March 27, 2002, Packer said, "I'm gonna turn it around and make it look like he (Copeland) did it." Exhibit 98 at 2.[4] Later that day, Clark told Packer that she would say Copeland was fighting with Bailey while Packer was at Hooker's house or waiting at the K–Mart. During another conversation, Packer and Clark discussed whether there was a witness to the murder. Packer said, "If there is a witness to it . . . I was wearing [Copeland's] clothes." Id. at 6. Packer and Clark continued to discuss their fabricated story and plans to implicate someone else over the course of several telephone calls. Sergeant Kaps listened to every phone call made to Clark from Packer and recorded certain telephone calls to tapes.

Prior to trial, Packer filed a motion to suppress the tapes of his telephone conversations with Clark from jail. Packer as-

2. Ind.Code § 35–42–1–1(1) (Supp.2002).

3. Ind.Code § 35–44–3–2(1) (1998).

4. We refer to the typed transcript of the tapes of the telephone conversations between Pack-

er and Clark that are found in State's Exhibit 98. We note that the transcripts of the tapes were only admitted to aid the jury while they listened to the tapes.

serted that the tapes of his conversations violated the Federal Wiretap Act and the Indiana Wiretap Act. The trial court denied Packer's motion to suppress. A jury trial was held. Packer renewed his objection when the State offered the tapes of his telephone conversations with Clark from jail as evidence. The trial court admitted the tapes into evidence over Packer's objection.

The State also presented testimony from Larry Biggs, an inmate at the jail. Biggs testified that Packer told him that Packer's girlfriend was having an affair with the person who was killed. Biggs asked Packer, "Did you do it?" Transcript at 562. Packer said, "Yes." Transcript at 562. Biggs said that Packer told him that he shot the person several times all over his body.

The jury found Packer guilty of murder, a felony. The jury also found Packer to be an habitual offender. The trial court sentenced Packer to the Indiana Department of Correction for a period of sixty-five years, with ten years suspended. The trial court enhanced his sentence by an additional thirty years because of the habitual offender determination, for a total sentence of ninety-five years, with ten years suspended.

The sole issue is whether the trial court abused its discretion by admitting the tapes of pretrial conversations Packer had with Clark during telephone calls from jail. Both Packer and the State frame the issue in this case as whether the trial court abused its discretion by denying Packer's motion to suppress the tapes. However, Packer did not seek an interlocutory appeal after the denial of his motion to suppress. Rather, he proceeded with his trial and objected to the admission of the evidence at trial. Thus, the issue is more appropriately framed as whether the trial court abused its discretion by admitting

the evidence at trial. *See, e.g., Washington v. State,* 784 N.E.2d 584, 587 (Ind.Ct. App.2003) (holding that the issue was more appropriately framed as whether the trial court abused its discretion by admitting the evidence at trial).

■■■ A trial court has broad discretion in ruling on the admissibility of evidence. *Smoote v. State,* 708 N.E.2d 1, 3 (Ind. 1999). We will reverse a trial court's ruling on the admissibility of evidence only when the trial court abused its discretion. *Washington,* 784 N.E.2d at 587. An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. *Id.* (citing *Huffines v. State,* 739 N.E.2d 1093, 1095 (Ind.Ct.App.2000), *trans. denied* ).

Packer argues that his substantive rights were violated by the State's failure to obtain proper authorization for the interception of the tapes and the trial court improperly admitted the tapes. Specifically, Parker argues that the tapes were obtained in violation of the Federal Wiretap Act and the Indiana Wiretap Act. Packer claims that the tapes were not obtained under a warrant as required under both the Federal Wiretap Act and the Indiana Wiretap Act. Packer further contends that neither the business exception, nor the consent exception applies. We will discuss the Federal Wiretap Act and the Indiana Wiretap Act separately.

### A. Federal Wiretap Act

In 1968, Congress enacted the Federal Wiretap Act, Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2510–2513, 2515–2522. The Federal Wiretap Act authorizes federal and state law enforcement officers to intercept wire, oral, or electronic communications in criminal investigations pursuant to a properly issued court order administered in

compliance with specific guidelines. *See* 18 U.S.C. § 2516 (2000) and 18 U.S.C. § 2518 (2000). While the Federal Wiretap Act prohibits the interception and introduction into evidence of telephone communications unless a court order is obtained authorizing the interception of the telephone conversations, the statute also contains two exceptions, i.e. the ordinary course of business exception and the consent exception. The ordinary course of business exception provides, in pertinent part, that "an investigative or law enforcement officer [5] in the ordinary course of his duties" may "intercept a wire, oral, or electronic communication" through an "electronic, mechanical, or other device." 18 U.S.C. § 2510(5)(a)(ii) (2000). The consent exception provides:

> It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral or electronic communication where such person is a party to the communication or one of the parties to the communication or one of the parties to the communication has given prior consent to such interception.

18 U.S.C. § 2511(2)(c) (2000).

The ordinary course of business exception to the Federal Wiretap Act's court order requirement applies to taped telephone conversations from a jail. As stated above, under 18 U.S.C. § 2510(5)(a)(ii), an investigative or law enforcement officer in the ordinary course of his business may intercept a wire, oral, or electronic communication through an electronic, mechanical, or other device. The Seventh Circuit addressed a similar matter in *United States v. Feekes*, 879 F.2d 1562, 1565 (7th Cir.

1989). There, the defendants argued that the introduction into evidence of tape recordings of phone calls made from inside the prison violated the Federal Wiretap Act. *Id.* at 1565. The government argued that the recording of the phone calls did not violate the Federal Wiretap Act. *Id.* The government relied on two exceptions: 18 U.S.C. 2511(2)(c), the consent exception, and 18 U.S.C. § 2510(5)(ii), the ordinary business exception. *Id.* The Seventh Circuit held that the ordinary business exception applied. *Id.* at 1566. The regulations of the Bureau of Prisons authorized the tape recording of all prisoner calls except to prisoners' lawyers. *Id.* In *Feekes*, the prisoner's phone calls were recorded in accordance with this regulation, which was the "ordinary course" for the officers who supervised the monitoring system. *Id.*

Additionally, this matter was addressed in *United States v. Daniels*, 902 F.2d 1238, 1245 (7th Cir.1990), *cert. denied*, 498 U.S. 981, 111 S.Ct. 510, 112 L.Ed.2d 522 (1990). There, the prison where Daniels was incarcerated routinely taped the phone conversations of its inmates. *Id.* at 1245. While incarcerated, Daniels contacted his co-defendants and discussed their pending trials. *Id.* Daniels and the co-defendants made incriminating statements during these phone conversations. *Id.* The Federal Bureau of Investigation obtained copies of these recordings and sought to admit them at trial. *Id.* The district court denied Daniels' motion to suppress the recordings as violative of the Federal Wiretap Act. *Id.*

The Seventh Circuit held that the recordings of Daniels' telephone calls oc-

---

**5.** Under the Federal Wiretap Act, an "investigative or law enforcement officer" means any officer of the United States or of a State or political subdivision thereof, who is empowered by law to conduct investigations of or to make arrests for offenses enumerated in this chapter, and any attorney authorized by law to prosecute or participate in the prosecution of such offense. 18 U.S.C. § 2510(7) (2000). Prison officials are "investigative or law enforcement officers" within the meaning of 18 U.S.C. § 2510(7). *United States v. Sababu*, 891 F.2d 1308, 1328 (7th Cir.1989).

curred during the ordinary course of business and, as such, were admissible under 18 U.S.C. § 2510(5)(a)(ii). *Id.* The wiretapping occurred during the ordinary course of business at the prison. *Id.* Moreover, the FBI agents obtained copies of these recordings and listened to the recordings to determine that Daniels had been conducting an illegal enterprise. *Id.* Because the prison was acting in its ordinary course of business and the FBI agents were acting within the ordinary course of their duties, the Seventh Circuit concluded that the government demonstrated an exception to allow the admissibility of the wiretap evidence. *Id.; see also* 18 U.S.C. 2510(5)(a)(ii).

Furthermore, this matter was discussed in *United States v. Hammond,* 286 F.3d 189, 191–193 (4th Cir.2002), *cert. denied,* 537 U.S. 900, 123 S.Ct. 215, 154 L.Ed.2d 172 (2002). There, the prison where Hammond was incarcerated routinely recorded and monitored the telephone conversations of its inmates. *Id.* at 191. The FBI obtained copies of the recordings and then listened and transcribed Hammond's telephone conversations with Tynes. *Id.* The tapes showed that Hammond coached Tynes about how to testify to corroborate his version of events. *Id.* Hammond sought suppression of the recorded telephone conversations, arguing that the recordings should have been excluded from evidence because the government did not comply with the requirements of the Federal Wiretap Act. *Id.* Following the Seventh Circuit's interpretation of the Federal Wiretap Act in *In re High Fructose Corn Syrup Antitrust Litigation,* 216 F.3d 621, 624–625 (7th Cir.2000), *cert. denied,* 531 U.S. 993, 121 S.Ct. 483, 148 L.Ed.2d 457 (2000), the district court found that once a recording was permitted under an exception to the Federal Wiretap Act, it was thereafter exempted from any further restrictions under the Federal Wiretap Act.

*Id.* at 191. Thus, the district court denied Hammond's motion to suppress the recordings as violative of the Federal Wiretap Act. *Id.*

The Fourth Circuit was also persuaded by the reasoning of the Seventh Circuit in *High Fructose,* 216 F.3d at 624–625. *Hammond,* 286 F.3d at 193. Specifically, the Fourth Circuit agreed with the Seventh Circuit's mode of analysis and concluded that once the recordings were intercepted under either the ordinary business exception or the consent exception, the recordings were exempted from any further restrictions under the Federal Wiretap Act. *Id.* Therefore, the Fourth Circuit held that the tapes of Hammond's telephone conversations were admissible because the Bureau of Prisons acted within its ordinary course of business when it recorded and monitored Hammond's telephone conversations during his incarceration. *Id.* at 191. Accordingly, the Fourth Circuit concluded that because the recordings were intercepted under the ordinary business exception, i.e. § 2510(5)(a)(ii), the recordings were exempted from any further restrictions under the Federal Wiretap Act. *Id.* at 193. Thus, the recordings were admissible as evidence. *Id.*

■ Likewise, here, Packer's telephone conversations with Clark were recorded during the ordinary course of business at the St. Joseph County Jail. The record indicates that the St. Joseph County Jail routinely monitored and recorded the phone conversations of its inmates. The system was computerized and automatically monitored and recorded all of the inmates' phone calls unless an inmate specifically requested that his phone calls not be monitored and recorded and the request was approved by the warden. Sergeant Kaps obtained copies of Packer's phone conversations with Clark as part of his

investigation of Bailey's murder. Because the jail was acting within its ordinary course of business, Sergeant Kaps was free to use the intercepted conversations. Thus, the trial court properly concluded that the State demonstrated an exception to allow the admissibility of the wiretap evidence. As such, the trial court did not abuse its discretion by admitting the tapes as evidence under 18 U.S.C. § 2510(5)(a)(ii). *See, e.g., Feekes,* 879 F.2d at 1565–1566; *Daniels,* 902 F.2d at 1245; *Hammond,* 286 F.3d at 193.[6]

### B. Indiana Wiretap Act

Next, Packer argues that the trial court abused its discretion by admitting the tapes of his telephone conversations with Clark as evidence in violation of the Indiana Wiretap Act. The State argues that the tapes were properly admitted under the consent exception to the Indiana Wiretap Act. We agree.

The Indiana Wiretap Act, provides, in pertinent part:

(a) This section does not apply to a person who makes an interception authorized under federal law.

(b) A person who knowingly or intentionally intercepts, a communication in violation of this article commits unlawful interception, a Class C felony.

(c) A person who, by virtue of the person's employment or official capacity in the criminal justice system, knowingly or intentionally uses or discloses the contents of an interception in violation of this article commits unlawful use or disclosure of an interception, a Class C felony.

Ind.Code § 35–33.5–5–5 (1998); *State v. Lombardo,* 738 N.E.2d 653, 655 (Ind.2000). The Indiana Wiretap Act defines "interception" as follows:

Interception means the intentional:

(1) recording of; or

(2) acquisition of the contents of;

a telephonic or telegraphic communication by a person other than a sender or receiver of that communication, without

6. Because the ordinary course of business exception under 18 U.S.C. § 2510(5)(a)(ii) of the Federal Wiretap Act applies, we need not address the consent exception under 18 U.S.C. § 2511(2)(c) of the Federal Wiretap Act. However, we note that in *Feekes,* the government argued that since significant efforts were made to notify inmates that their telephone calls (other than to their lawyers) would be monitored and the defendant used the phones anyway, he consented to his conversation being recorded. *Feekes,* 879 F.2d at 1565–1566. The Seventh Circuit acknowledged that the consent exception was accepted in *United States v. Amen,* 831 F.2d 373, 378–379 (2nd Cir.1987). *Id.* Nevertheless, the Seventh Circuit found that the consent exception did not apply in *Feekes* because "to take a risk [was] not the same thing as consent." *Id.* Additionally, in *Daniels,* the Seventh Circuit again determined that the issue of the consent exception did not need to be addressed because the ordinary business ex-

ception applied. *Id.* However, after acknowledging that a respected sister court, *Amen,* 831 F.2d at 379, had accepted the consent exception of the Federal Wiretap Act in regard to the taping of inmates' telephone calls, the Seventh Circuit declined to place any weight on *Amen. Id.* Even though Daniels signed a form stating, "I understand that telephone calls I make from institution telephones may be monitored and recorded," and stated in the monitored and recorded conversations: "don't think for one minute this conversation ain't being recorded," Daniels thought by the use of a simple code he could prevent eavesdroppers from understanding what he was doing. *Id.* He thought wrong. *Id.* The Seventh Circuit stated that taking a risk was not the same thing as consenting to the consequences if the risk materializes. *Id.* Therefore, the Seventh Circuit declined to apply the consent exception of the Federal Wiretap Act. *Id.*

the consent of the sender or receiver, by means of any instrument, device, or equipment under this article. This term includes the intentional recording of communication through the use of a computer or a FAX (facsimile transmission) machine.

Ind.Code § 35–33.5–1–5 (1998); *Lombardo,* 738 N.E.2d at 655.

Like its federal counterpart, the Indiana Wiretap Act also contains an exclusionary rule. Under the Indiana Wiretap Act's exclusionary rule:

The contents of an interception under this article or evidence derived from the interception may not be received into evidence or otherwise disclosed during a court proceeding unless each party, not less than fourteen (14) days before the proceeding, has been furnished with a copy of the application, warrant, and any orders for an extension under which the interception was authorized. The fourteen (14) day period may be waived by the court if the court finds that:

(1) it is not possible to furnish each party with the information at least fourteen (14) days before the proceeding; and

(2) a party will not be prejudiced by the delay in receiving the information.

Ind.Code § 35–33.5–5–1 (1998).

◼ Here, Sergeant Kaps failed to secure a warrant before intercepting the telephone conversations between Packer and Clark. Nevertheless, we conclude that the tapes of Packer's telephone conversations with Clark do not violate the Indiana Wiretap Act and that the contents of the tape recordings are admissible into evidence because the tape recordings in this case do not qualify as "interceptions." *See Apter v. Ross,* 781 N.E.2d 744, 756 (Ind.Ct.App.2003), *trans. denied.* Under the Indiana Wiretap Act, the recording of a telephonic or telegraphic communication is not an "interception" if it is done with the consent of the sender or receiver of the communication. Ind.Code § 35–33.5–1–5 (1998). The record indicates that Packer consented to the recording of his telephone conversations while he was in the St. Joseph County Jail. Packer received the St. Joseph County Inmate Handbook, and he signed the form stating he understood its contents. The handbook specifically stated that all phone calls from inmates were subject to being recorded and monitored. The St. Joseph County Jail had installed the system to record every call, in part, to aid criminal investigations. When a telephone call was made from the St. Joseph County Jail, an announcement played informing the parties that the telephone call was from a correctional institution and that the telephone call was subject to being recorded and monitored. Further, the handbook stated that to prevent the recording and monitoring of a telephone conversation, Packer could have requested and received permission from the warden for an unrecorded telephone conversation. Moreover, Packer could have refrained from using the phone or he could have used the phone without making overtly incriminating statements. Packer instead chose to use the telephone system with the recording and monitoring system. In doing so, Packer gave his consent to the recording and monitoring of his phone conversations from jail. With this in mind, we conclude that Packer's telephone conversations were not intercepted within the meaning of Ind.Code § 35–33.5–1–5. Thus, the tapes of Packer's telephone conversations with Clark from jail did not violate the Indiana Wiretap Act, and the trial court did not abuse its discretion in admitting the tapes. *See, e.g., Apter,* 781 N.E.2d at 756 (holding that the contents of the tape recording were admissible into evidence because consent to the taping

existed and, thus, the tape recording did not qualify as an "interception").[7]

### C. Harmless Error

 Even assuming arguendo that the trial court erred by admitting the tapes of Packer's telephone conversations with Clark from jail, we find that any such error is harmless. "Evidence admitted in error may not require reversal if the error is found to be harmless." *Overstreet v. State*, 783 N.E.2d 1140, 1156 (Ind.2003). Error in the admission of evidence is harmless "when the conviction is supported by substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood the questioned evidence contributed to the conviction." *Bocko v. State*, 769 N.E.2d 658, 665 (Ind.Ct.App.2002), *reh'g denied, trans. denied.*

 Here, the State presented substantial independent evidence of Packer's guilt. The record indicates that Bailey was found dead from twelve gunshot wounds. Bailey was lying in the grass between two apartment buildings and near the windows of Packer and Clark's apartment. There were 9mm cartridge casings spread out around the ground, including some by the windows of Packer's and Clark's apartment. Additionally, the record reflects that Bailey was holding a piece of paper with Packer and Clark's apartment number written on it. According to Davidovich's testimony, Bailey left her apartment to write down Packer's apartment number so he could call the police. Bailey was upset because he suspected that Packer had vandalized the car he had been driving.

Moreover, the record contains testimony from Hernton, Chya, Davidovich, Biggs, and Cheryl Carter. Hernton testified that he overheard Packer and Clark fighting about her involvement with another man. Hernton also testified that he overheard Packer threaten to kill the man that Clark was dating. Chya, a maintenance man for the Courtyard Place Apartments, testified that he saw Packer vandalize a blue car in the parking lot of the complex. Packer stabbed the tires and cracked the steering column of the blue car. Davidovich testified that Bailey was driving the blue car that was vandalized. The blue car was registered to Clark.

Additionally, the record reflects that Packer told Biggs that Clark was having an affair with the person who was killed. Biggs testified that he asked Packer, "Did you do it?" Packer answered, "Yes." *Id.* Biggs further testified that Packer said that he shot the man that Clark was having an affair with several times all over his body. The record further shows that Cheryl Clark testified that while she was sitting with Packer, Clark, and her fiancé in her living room, Clark said, "Aaron [Packer] shot Terry [Bailey]." *Id.* at 536. Cheryl Clark also testified that Packer did not deny this statement. In light of this evidence, we conclude that any error in the admission of the evidence of Packer's telephone conversations with Clark from jail was harmless and did not affect Packer's substantial rights. *See, e.g., Bocko,* 769

---

**7.** We note that in *State v. Lombardo*, 738 N.E.2d 653, 659–660 (Ind.2000), our supreme court held that the Indiana Wiretap Act does not incorporate by reference federal case law on the intercepting of telephone communications. Therefore, we may conduct an independent analysis of the consent exception under the Indiana Wiretap Act without regard to the Seventh Circuit's interpretation of the consent exception under the Federal Wiretap Act. Additionally, we note that the Indiana Wiretap Act does not have an "ordinary business" exception; therefore, we need not address this exception under our review of the Indiana Wiretap Act.

N.E.2d at 665 (holding that error in the admission is harmless when the conviction is supported by substantial independent evidence of guilt).

For the foregoing reasons, we affirm Packer's conviction and sentence for murder, a felony.

Affirmed.

BAKER, J., and BROOK, C.J., concur.