## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 30 2018, 8:10 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Ryan M. Gardner
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Christina D. Pace
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Joe E. Jackson, Jr.,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 30, 2018

Court of Appeals Case No.
02A03-1709-CR-2179

Appeal from the
Allen Superior Court

The Honorable
Frances C. Gull, Judge

Trial Court Cause No.
02D05-1612-F4-90

**Kirsch, Judge.**

[1]     Following a jury trial, Joe E. Jackson, Jr. ("Jackson") was convicted of Level 4 felony unlawful possession of a firearm by a serious violent felon,[1] and he now appeals raising the following restated issued: whether the trial court abused its discretion when it admitted, over Jackson's objection, recorded phone calls that Jackson made from jail.

[2]     We affirm.

## Facts and Procedural History

[3]     At around 6:15 a.m. on December 19, 2016, multiple law enforcement agencies, including officers from the Indiana State Police ("ISP") Emergency Response Team, executed a search warrant at a certain Fort Wayne, Indiana residence ("the residence") that was owned or leased by a man named William Pope ("Pope"). The warrant was issued and executed following a narcotics investigation by ISP officers assigned to the Bureau of Alcohol, Tobacco, and Firearms ("ATF") Task Force. The investigation included surveillance and began on November 3, 2016. During the investigation and surveillance of the residence, Jackson's vehicle was seen there on six occasions, and he was observed at the residence on three occasions.

[4]     When officers entered the residence, five individuals, including Jackson, were in the residence, with some in the living room and others in the kitchen. *Tr.*

---

[1] *See* Ind. Code § 35-47-4-5(c).

*Vol. 2* at 85. ISP Detective Caleb Anderson ("Detective Anderson"), who had participated in the ATF Task Force surveillance, searched a bedroom in the northeast part of the residence and, specifically, the closet. Half of it contained men's clothing and the other half was women's. As is relevant here, Detective Anderson found on the floor of the men's side of the closet a Ruger nine-millimeter pistol. It was behind a book bag and on top of a pair of men's shoes. There was one live round in the chamber, and the safety was off; the magazine was loaded with sixteen rounds, and on the floor near the shoes was a fired nine-millimeter shell casing. In the closet, he also found clothing consistent with Jackson's size, including some shirts and hats embroidered with the name of Jackson's motorcycle club, and a Menard's receipt with Jackson's name on it. On the top shelf of the closet, police found a Ruger pistol box, matching the make, model and serial number of the found firearm, a box of ammunition in the Ruger box, and a receipt for purchase of the Ruger in the name of Bree Jackson ("Bree"). Bree was later determined to be Jackson's brother's wife.

[5] Jackson was arrested and transported to the police station. Detective Anderson and another ISP officer interviewed Jackson. After receiving and waiving his Miranda rights, Jackson admitted that he had been staying "on and off" at the residence since around October 2016, that he was staying there for free, and that his bedroom was the one in the northeast corner. *Tr. Vol. 2* at 113, 117; *State's Ex. 42*. He acknowledged having some shoes and clothing in the room, including some that reflected the name of his motorcycle club. Jackson initially denied owning the gun, but then admitted that, in September or October of

2016, he purchased the gun for $150 from an individual named Chris Walker ("Walker"), who was a friend or family member of Bree's. *Tr. Vol. 2* at 114. Jackson said the firearm came with the box and ammunition. Jackson told officers that, at some point after buying it from Walker, he realized that the firearm had been stolen from Bree or her husband, Jackson's brother, but that Jackson's brother did not want the gun back, so Jackson kept it in the bedroom and off the streets.

[6] On December 27, 2016, the State charged Jackson with Count I, unlawful possession of a firearm by a serious violent felon, Count II, possession of marijuana, and Count III, possession of paraphernalia. *Appellant's App. Vol. II* at 18-23.

[7] From the time of his arrest in December 2016 through June 2017, Jackson made at least eleven phone calls from the Allen County Jail ("the jail") using the jail's GTL Client telephone equipment system ("GTL system"). At the beginning of each call, there is an announcement advising that the call is being made from a correctional facility and that the telephone call is subject to monitoring and recording. *State's Ex. 43*. Every inmate has a personal identification number ("PIN") assigned to him or her, and each phone has a corresponding video camera that records the inmate as he or she is on the phone. Jackson used his PIN for ten of the eleven calls. In every call, Jackson was documented on video. Some of Jackson's calls were to Pope, others to Bree, and others were to unidentified individuals.

[8]     On July 12, 2017, the trial court granted the State's request to dismiss the two misdemeanor charges, Counts II and III.  On July 19, 2017, the case proceeded to jury trial.  At trial, Detective Anderson testified that his interview with Jackson was video recorded, and the disk of that recorded interview was admitted into evidence and played for the jury.  *State's Ex. 42*; *Tr. Vol. 2* at 117.  Detective Anderson described that during the interview Jackson "gave . . . a full confession, including where he bought [the firearm], from who, for how much, he described the gun case and the ammunition."  *Tr. Vol. 2* at 117.

[9]     On cross-examination, Detective Anderson agreed that the Menard's receipt with Jackson's name on it, dated in December 2016, had a different address than that of the residence.  *State's Ex. 21*.  He also acknowledged that at some point during the execution of the warrant, Jackson advised someone that he was diabetic, so ATF Special Agent Kristin Pyle, who was a medic, checked on Jackson to make sure he was alright.  She testified that she spoke to him, checked his blood sugar, and was with him as he administered his own insulin.  She said he was coherent and did not exhibit symptoms associated with having a diabetic incident, such as he was not nauseous, confused, or shaky, and she noted that he had normal manual dexterity to administer his insulin.  Detective Anderson gave him some food in the police car while being transported to the police station, and Jackson was eating a piece of fruit during the recorded police interview.

[10]    Allen County Sheriff's Department Officer Jeffrey Kroemer ("Officer Kroemer"), who was the administrator of the jail's GTL system, testified that

he accessed the ten phone calls made using Jackson's PIN. He also accessed a phone call made on June 29, 2017 on the PIN of another inmate, who was housed in the same block as Jackson, noting that it was "common" for inmates to borrow the PIN of another inmate when making a call. Officer Kroemer stated that he watched the corresponding video recordings of the phone calls, including the June 29, 2017 phone call and testified, "[Y]ou can clearly see Mr. Joe Jackson using the phone." *Tr. Vol. 2* at 143-44. At trial, he identified Jackson as the person that had made all eleven of the phone calls in question. *Id*. at 144. Officer Kroemer stated that he pulled audio recordings of Jackson's calls from the GTL system and put them on a disk, which he marked with his "CO number and initials," as he does "in the same place on every CD that I do." *Id*. at 146. At trial, Officer Kroemer identified the disk of the recorded calls, said he listened to it three times, and stated the disk was a fair and accurate recording of the eleven jail calls that were on the GTL system. *Id*.

[11] The State sought to admit the disk containing the recording of the eleven phone calls into evidence, and counsel for Jackson asked whether Officer Kroemer could identify the individuals on the other end of the phone call. Officer Kroemer replied, "No, not really. I heard a couple brief names, but you know, it's not part of my job to identify who's on the other line." *Id*. Jackson's counsel objected to the admission of the disk "because the officer cannot identify the individuals who are allegedly speaking to Mr. Jackson." *Id*. at 147. The State responded that the recorded calls are statements of a party opponent and an exception to the hearsay rule, and, additionally argued, "[I]t is

admissible subject to the rule of completeness. This gives context as to the conversation that [Jackson]'s having." *Id.* The trial court admitted the disk over Jackson's objection. *State's Ex. 43.*

[12] The recorded calls were played for the jury. In the calls, Jackson indicated that Bree needed to make a statement that the firearm was hers and that she left it in the room. Jackson told one person, "[W]e need to be discreet," and in another call he told an individual that he needed to get in touch with Bree to give her information about the layout of the room. *Tr. Vol. 2* at 159; *State's Ex. 43.* In a different call, Jackson stated that he had learned from another source that he could recant his statement on the basis that he was incoherent due to his blood sugar being low. *State's Ex. 43.*

[13] Jackson testified that he was only visiting the residence, was not living or staying there, and had gone to bed in one of the bedrooms that Pope had told him he could lay down in. He testified that "not all items" in the bedroom were his, explaining that he had only brought a few articles of clothing into the room from his vehicle. *Tr. Vol. 2.* At 169. He said he was awakened to law enforcement with guns in his face and escorted to the living room. He described that, due to his blood sugar level, he was "a little bit incoherent," and he did not remember "signing waivers or anything." *Id.* at 155-56. He denied that the firearm was his and explained that he confessed to having purchased and possessing it because the officers threatened to pursue his fiancée, so to "defend or protect" her, he "confessed and made a statement that was necessary, not true." *Id.* at 157, 165. He testified that he did not know whether

the gun was Bree's or not and that he made phone calls "to see if this is Bree's gun[.]" *Id*. at 158. He explained that in some calls he was trying to have someone reach Bree "to tell her to come and claim her gun." *Id*. He stated that in one call he asked Pope to "holler" to Bree and "get her to confess it's her gun . . . and to show that I didn't have nothing to do with it." *Id*. at 159. In his testimony, Jackson identified that one or more calls were to Pope and one or more were to Bree. Jackson wanted Bree to "admit to her gun" and "get it off of me because I was being charged with it." *Id*. at 161.

[14] The jury found Jackson guilty of Level 4 felony possessing a firearm as a serious violent felon, and the trial court subsequently sentenced him to ten years of imprisonment. He filed a motion to correct error, which the trial court denied. Jackson now appeals.

## Discussion and Decision

[15] Jackson contends that the trial court erred when it admitted into evidence the recordings of phone calls he made from jail to unidentified individuals. A trial court has broad discretion in ruling on the admissibility of evidence. *Packer v. State*, 800 N.E.2d 574, 578 (Ind. Ct. App. 2003), *trans. denied*. We will reverse a trial court's ruling on the admissibility of evidence only when the trial court abused its discretion. *Id*. An abuse of discretion occurs when a decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Id*. We may affirm a trial court's admissibility ruling on any theory supported by the record. *Steinberg v. State*, 941 N.E.2d 515, 522 (Ind. Ct. App.

2011), *trans. denied*. Errors in the admission or exclusion of evidence are to be disregarded as harmless unless they affect the substantial rights of a party. *King v. State*, 985 N.E.2d 755, 757 (Ind. Ct. App. 2013) (citing Ind. Trial Rule 61), *trans. denied*.

[16] On appeal, Jackson does not assert that he did not make the calls or that he did not know that the calls were being recorded. Rather, his claim is that the trial court abused its discretion when it admitted the phone calls from jail because the State "fail[ed] to lay the proper and necessary foundation and authentication" of the recorded phone calls. *Appellant's Br*. at 4. Specifically, his contention is that it was error to admit the calls because the State did not identify the persons to whom Jackson was speaking in the phone calls.

[17] The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. Ind. Evidence Rule 901(a); *Davenport v. State*, 749 N.E.2d 1144, 1148 (Ind. 2001). Here, Officer Kroemer, the GTL jail call system administrator, testified that he retrieved ten calls that were made with Jackson's assigned PIN and another call made with the PIN of another inmate. He saved the eleven phone calls from the system on a disk, which he marked with his "CO number and initials" and which he identified as his at trial. *Tr. Vol. 2* at 146. He also obtained the corresponding video recordings, and he identified Jackson in the video recordings as the person that made the eleven telephone calls in question. This testimony was sufficient to

establish the CD as an authentic recording of the recorded jail calls made by Jackson.

[18] Nevertheless, Jackson contends on appeal that "[t]he identities of both parties must be authenticated before admitting a telephone call into evidence," and because the other person on the receiving end of some of Jackson's phone calls was not identified, they should have not been admitted. *Appellant's Br.* at 12. In support of his position, Jackson cites to *King v. State*, 560 N.E.2d 491, 496 (Ind. 1990). In *King*, the defendant sought to introduce at trial the testimony of the former receptionist at the law firm that represented defendant; she was going to testify that she received a phone call from someone purporting to be the victim, who told the receptionist that she had lied about defendant's actions. *Id.* at 494. The State objected at trial on the basis of hearsay, and the trial court sustained it. On appeal, our Supreme Court affirmed the trial court's exclusion of the receptionist's testimony, stating, "This Court has long required that a caller's identity be established as a foundation for the admission of the content of the telephone call." *Id.* at 495. Jackson argues that, in his case, "similar to *King* . . . the State failed to lay the necessary foundation for the introduction of the jail telephone call recordings[.]" *Appellant's Br.* at 13. We disagree and find that *King* is both distinguishable and not applicable.

[19] In contrast to *King*, where a witness was attempting to testify about a call he or she received, here the State sought to introduce phone calls made by Jackson. He was identified at trial as the person making the calls by his PIN and by the corresponding video recordings of him on the phone. Our court has held that

"[g]enerally recordings of telephone calls made from jail are admissible when the defendant discusses the crime for which he is incarcerated." *King*, 985 N.E.2d at 759 (rejecting defendant's claim the calls were inadmissible hearsay); *see also Baer v. State*, 866 N.E.2d 752, 763 (Ind. 2007) (excerpts of recorded calls made by defendant to sister from jail complied with Indiana Wiretap Act and were admissible). Thus, we find that Jackson's recorded phone calls were properly admitted into evidence.

[20] Furthermore, even if, as Jackson claims, it was error to admit the recorded phone calls, any error was harmless. "'The improper admission of evidence is harmless error when the conviction is supported by substantial independent evidence of guilt as to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the conviction.'" *Steinberg*, 941 N.E.2d at 527 (quoting *Cook v. State*, 734 N.E.2d 563, 569 (Ind. 2000)). Although Jackson suggests that the recorded calls "were virtually the only evidence supporting the State's theory that Jackson possessed the Firearm," the record provides otherwise. *Appellant's Br.* at 10. Here, the parties stipulated that Jackson had a prior qualifying conviction and could not lawfully possess a firearm. *Tr. Vol. 2* at 75; *State's Ex*. 1. Jackson admitted to police that he stayed "on and off" at the residence and that that his bedroom was in the northeast corner of the home. *Tr. Vol. 2* at 113. The Ruger was found in the closet of that bedroom, among items of clothing reflecting Jackson's motorcycle club name. Jackson admitted in his police interview that he bought the firearm in the fall of 2016, stating that he bought it in a park from Walker and paid

$150. He described the gun as being silver and black, which it was. He said that he later learned that Walker had stolen the gun from his brother or from Bree, which matched the receipt found in the bedroom reflecting that Bree purchased it from a firearms store. *State's Ex. 22*. Thus, what Jackson told Detective Anderson in the interview was consistent with the evidence found during the search. Although Jackson later stated at trial that what he had told police in the interview was not true, and that at the time of the search and interview he was having a diabetic episode and was not coherent, this was contrary to other evidence presented, and it was for the jury to assess witness credibility. *See Causey v. State*, 808 N.E.2d 139, 143 (Ind. Ct. App. 2004) (this court does not assess credibility of witnesses). Jackson's conviction was supported by independent evidence of guilt, and we are satisfied that that there is no substantial likelihood that the questioned evidence contributed to the conviction.

[21] Affirmed.

Baker, J., and Bradford, J., concur.