## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 30 2019, 10:00 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Joseph P. Hunter
Muncie, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Caryn N. Szyper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jeremy Holland,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | September 30, 2019<br><br>Court of Appeals Case No.<br>18A-CR-2155<br><br>Appeal from the Delaware Circuit Court<br><br>The Honorable Thomas A. Cannon, Jr., Judge<br><br>Trial Court Cause No.<br>18C05-1703-MR-3 |

**Robb, Judge.**

# Case Summary and Issues

[1]     Following a jury trial, Jeremy Holland was convicted of murder, a felony; aiding, inducing or causing criminal confinement, a Level 3 felony; and unlawful possession of a firearm by a serious violent felon, a Level 4 felony. The trial court sentenced Holland to serve sixty-one years in the Indiana Department of Correction ("DOC"). Holland appeals, raising the following restated and expanded issues: (1) whether the trial court erred in admitting evidence of Holland's statements to law enforcement;[1] and (2) whether the trial court erred in vacating Holland's criminal confinement conviction rather than his felony murder conviction due to double jeopardy concerns. Concluding the challenged evidence was merely cumulative, the admission of which was harmless, and the trial court properly vacated Holland's lesser conviction, we affirm.

# Facts and Procedural History

[2]     On February 13, 2017, Terence Walker picked up Alonzo Williams from a residence on Walnut Street in Muncie, Indiana, where Holland and Joshua Erwin lived. Williams had his Tech 9 handgun with him, and they returned to Walker's house. At the house, Walker informed Williams that Jeffrey Brown

---

[1] Holland raises the issue as error in denying a motion to suppress; however, Holland appeals the admission of this evidence after a completed trial. Thus, the issue is more appropriately framed as whether the trial court abused its discretion by admitting the evidence at trial. *See Packer v. State*, 800 N.E.2d 574, 578 (Ind. Ct. App. 2003), *trans. denied*.

had been involved in the murder of Joseph Johnson, Williams' cousin, which had occurred eight days prior. Walker then showed Williams a text message he had received regarding the murder, which caused Williams to become "upset and confused." Transcript of Evidence, Volume 2 at 191. Williams "said he needed to go make some money so he wanted to go sell some weed." *Id.* at 192. Sometime between 6:00 and 7:00 p.m., Williams left his Tech 9 at Walker's house, took Walker's 9mm Ruger, borrowed Walker's blue GMC Yukon SUV, and drove back to Holland's house.

[3] Around 11:00 p.m., Williams and Holland went to Brown's house – where Brown lived with his wife and children. Brown's wife knew someone had arrived at the house because she heard the loud noise of the SUV. Williams and Brown conversed on the back porch of the house while Holland smoked a cigarette in the kitchen. After Williams and Brown came back inside the house, Brown told his wife, "I'll be right back," and the three men left. *Id.* at 241. Around midnight, they went to Walker's residence so Williams could pick up his Tech 9. While Walker fixed one of the SUV's headlights, Williams went inside and retrieved the Tech 9. Walker testified that he observed Brown and Holland in the SUV. At some point, Williams told Walker he and Holland "had a lick to set up to get Mr. Brown out of town[,]" meaning they planned to commit robbery. *Id.* at 197. When Williams and Holland left, the vehicle was in good condition and the headlight had been fixed.

[4] Williams, Holland, and Brown, all armed with handguns, traveled to a house on Andover Street where Steven McPherson, Shelli Good, and Curtis Atkinson

lived. Williams supplied McPherson, Good, and Atkinson with some methamphetamine he brought with him, and the four of them ingested the substance. After, Williams asked to see Brown's gun, grabbed it from Brown's hand, and removed the magazine. Williams then pointed the gun at Brown, pushed him against the door, patted him down, and took methamphetamine from Brown's pocket. At the same time, Holland was standing on the other side pointing his firearm at Brown.

[5] Williams told Brown he was going to kill him for murdering his cousin and Brown said he was not involved and pleaded for his life. Williams then instructed Good to get duct tape, so she grabbed a "black, cloth-like tape" from her dresser and pulled a drawstring from a pair of sweatpants and handed it to McPherson. Tr., Vol. 3 at 24. With his gun pointed at McPherson, Williams ordered McPherson and Atkinson to tie Brown up. While Holland had his gun pointed at Brown, Atkinson and McPherson used the string to tie Brown's hands behind his back. Williams then ordered McPherson to go outside, start the SUV, and push the passenger seat closer to the dash. McPherson complied and when he came back into the house, Williams and Holland still had Brown at gunpoint up against the door. McPherson recalled Williams telling Brown he was "just going to drive [him] out of town, let [him] go and give [him] a pass." *Id*. at 57. Williams and Holland escorted Brown out the back door, at gunpoint, and drove away in the SUV.

[6] At 1:00 a.m. the next morning, Gary Greenlee, Jr. heard a "loud muffler [of a vehicle]. . . going back and forth" near his home. Tr., Vol. 2 at 54. He

observed an SUV pull into his parents' property across the street, which he described as a secluded wooded area. Later, he heard roughly seventeen gunshots. Greenlee contacted his parents to notify them of the shots and that the chain securing their property had been forced open; he also called 911.[2] Greenlee's father, Gary Greenlee, Sr., drove across his property and wrapped the chain around a post and went back to bed.

[7] Holland and Williams returned to the Walnut Street house around 1:30 a.m. Holland was calm but Williams appeared erratic, "a little hyped up" and emotional. Tr., Vol. 3 at 84. Upon arrival, Williams possessed the Tech 9 firearm and asked Erwin to clean the gun, but he refused. Around 10:00 or 11:00 a.m., Williams returned Walker's SUV in poor condition. Walker testified, "My front grill was gone and my headlights were busted out. On each fender . . ., it was dented in from a chain or something. . . . It had mud caked in the door wells, the wheel wells and in my front passenger seat." Tr., Vol. 2 at 200. Walker asked Holland about his 9mm Ruger, which Williams had taken earlier, and Holland stated that they sold it and he was going to try to replace it. Walker washed his SUV and took it to be repaired.

[8] Just after noon, Greenlee Sr. went to fix the broken chain on his property and discovered the body of a partially covered man with his hands bound behind his

[2] It is unclear from the record how law enforcement responded to this call.

back, later identified as Brown. Greenlee Sr. called 911 immediately and police arrived shortly thereafter.

[9]     An autopsy report revealed Brown had been shot ten times, including seven shots to his head and neck. At the scene, police recovered thirteen 9mm casings and plastic pieces from a headlight assembly matching the SUV Williams had borrowed. *See* Tr., Vol. 2 at 98-99; Tr., Vol. 3 at 111. Police discovered tire and mud tracks matching Walker's SUV, as well as blue paint on the chain from Greenlee's property. One 9mm casing was also recovered from Brown's hoodie during the autopsy. Cell phone records corroborated Holland's movements from the general vicinity of the Andover Street house to the crime scene and then back toward his house on Walnut Street at the pertinent times. Tr., Vol. 3 at 217, 230.

[10]    The same day as the murder, Jaime Phillips, Holland's girlfriend, had been released from a hospital on the north side of Indianapolis and drove to Holland's house. Phillips testified that Holland admitted to her that he and Williams borrowed Walker's vehicle and planned on robbing Brown. Holland confessed that he and Williams went to Brown's house, then the three of them went to a "junkie's house on the north side of town" and Williams ordered the "junkies" to tie Brown up. *Id*. at 176. Holland further admitted they put Brown, tied up, in the backseat of the truck; Williams drove, and he was in the passenger seat. Although Phillips stated Holland initially said he was not involved in Brown's murder, Phillips later told police that Holland admitted he

was present when Williams shot Brown and that the incident "f\*\*ked with his mind[.]" *Id.* at 191.

[11] Police began investigating Brown's murder. Officer Kurt Walthour of the Delaware County Sheriff's Office, in conjunction with the Muncie Police Department ("MPD"), interviewed Walker, Erwin, Good, McPherson, and Walker's wife. On February 16, Holland was *Mirandized*, interviewed, and subsequently released. As a result of the investigation, Williams and Holland were identified as suspects in Brown's murder.

[12] On March 4, Phillips called the police and alleged that two MPD investigators had confined her and Holland in the Walnut Street house – where she had been living with Holland and Erwin. MPD Officer Scott O'Dell responded and met Phillips outside the house, along with another officer on the scene. Phillips informed Officer O'Dell that Holland was inside, and, at the time, Officer O'Dell was aware Holland was a suspect in Brown's murder.[3] Officer O'Dell asked Phillips for permission to go inside to evaluate the scene where the alleged confinement occurred. Phillips consented. Officer O'Dell and Officer Jeff Pease followed Phillips inside the house. Phillips showed the officers the area she alleged the two investigators had confined them. At some point, the officers reached a locked bedroom door and Officer O'Dell asked who was inside to which Holland responded and asked the officers to slide a witness

---

[3] Officer O'Dell testified that he partook in the murder investigation.

statement under the door.  Holland eventually identified himself to the officers.  Believing they had probable cause to arrest Holland at that time for felony murder, criminal confinement, and possession of a handgun by a serious violent felon, Officer Pease then kicked the door open.  Holland was taken into custody and transported to the police department.

[13]  At the station, Officer Walthour advised Holland of his *Miranda* rights[4] and interviewed him.  Holland admitted to being with Williams the night of the murder but denied being part of the murder.  *See* Exhibits, Volume 6 at 2.  Holland stated he did not see the murder take place.  Following the interview, Officer Walthour prepared a probable cause affidavit for Holland's arrest without a warrant and arrested Holland.

[14]  Two days later, Officer Walthour received a text from Phillips indicating that Holland wanted to speak with him again.  Holland was in jail, so they met in the interview room.  Officer Walthour confirmed that Holland wished to speak with him and advised him of his *Miranda* rights.  Holland signed a waiver and voluntarily spoke with Officer Walthour.  Holland again denied involvement in Brown's murder.  He stated that he did not kill anyone and never witnessed the

---

[4] With respect to the advisement, Officer Walthour testified: "I have a sheet of paper, I do it the exact, same way every time, read [the rights] off to him, ask if he understood them, asked if he could read and write the English language, checked them off as I read each one of them to him, then I have him sign."  Tr., Vol. 2 at 22.  This form was admitted into evidence at trial.  *See* Exhibits, Volume 1 at 1.

murder. Instead, Holland stated that Williams told him that he killed Brown. *See id.*

[15] On March 10, the State charged Holland with the following: Count 1, felony murder; Count 2, aiding, inducing, or causing criminal confinement, a Level 3 felony; and Count 3, unlawful possession of a firearm by a serious violent felon, a Level 4 felony. Holland filed a Motion to Suppress the statements he made to law enforcement during his March 4 and 6 interviews. Holland argued his statements should be suppressed because they were a product of an illegal search and arrest and thus, violated the state and federal constitutions. Following a suppression hearing, the trial court denied Holland's motion.

[16] A jury trial was held during which Holland's March 4 and 6 videotaped police interviews were admitted and played for the jury over his continuing objection. The jury found Holland guilty as charged. The trial court entered judgment of conviction for felony murder and unlawful possession of a firearm by a serious violent felon. However, because kidnapping was the predicate felony for Holland's felony murder conviction, the trial court declined to enter judgment of conviction for aiding, inducing, or causing criminal confinement, Count 2, due to double jeopardy concerns. The parties were given ten days to submit briefs on the double jeopardy issue. The State argued that a judgment of conviction on Count 2 would not violate double jeopardy. Holland, on the other hand, argued that his murder conviction should be vacated because "the continuing confinement began first" and "[o]nly one conviction can be entered[.]" Appellant's Appendix, Volume 3 at 27-28. At the sentencing

hearing, the trial court denied Holland's motion to vacate the conviction on Count 1 and declined to enter a judgment of conviction on Count 2 as it would violate double jeopardy. The trial court's sentencing order provided, in pertinent part:

> The Court finds that the Constitutional principle of double jeopardy bars the Court from entering judgment of conviction for Count 2, because to do so would impose multiple punishment for a crime which consists of the same act as an element of the crime of Felony Murder for which [Holland] was convicted. The actual evidence at trial does not differentiate the confinement of the victim separately from his removal by force from one place to another, the kidnapping. The acts of holding the victim at gunpoint, tying his hands behind his back, placing the victim in a car and driving him out into the country where he was taken out of the car, before being shot to death by [Holland's] accomplice, are the predicate facts of the underlying felony, kidnapping, supporting the Felony Murder conviction. In this case, there is more than a reasonable possibility that the evidentiary facts used to establish the essential elements of kidnapping, in the Felony Murder, Count 1, may also have been used to establish the essential elements of "confining" of the challenged offense, Count 2, Confinement. Therefore, the two (2) counts merge for sentencing purposes.

*Id*. at 88-89. The trial court sentenced Holland to fifty-five years on Count 1 and six years on Count 3 to be served consecutively and executed in the DOC. Holland now appeals.

# Discussion and Decision

# I. Admission of Evidence

[17]   Holland argues the trial court erred in admitting his statements to law enforcement during his March 4 and 6 interviews because the statements were the product of an illegal search and arrest. The State asserts that "[a]ny error . . . was immaterial because Holland's statements were merely cumulative given the other evidence presented at trial that overwhelmingly proved Holland's guilt[.]" Brief of Appellee at 26.

[18]   Our standard of review in this area is well-settled. The admission of evidence falls within the sound discretion of the trial court, and we review the trial court's decision for an abuse of that discretion. *Mack v. State*, 23 N.E.3d 742, 750 (Ind. Ct. App. 2014), *trans. denied*. An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Morrison v. State*, 824 N.E.2d 734, 739 (Ind. Ct. App. 2005), *trans. denied*. However, if a trial court abuses its discretion by admitting challenged evidence, we will only reverse for that error if the error is inconsistent with substantial justice or if a substantial right of the party is affected. *McVey v. State*, 863 N.E.2d 434, 440 (Ind. Ct. App. 2007) (internal quotations omitted), *trans. denied*. Any error caused by the admission of evidence is harmless error for which we will not reverse a conviction if the erroneously admitted evidence was cumulative of other evidence properly admitted. *Id*.

[19] Based on our review of the record, the evidence which Holland argues the trial court erred in admitting into evidence was merely cumulative of other properly admitted evidence demonstrating Holland's guilt, including:

- Good, McPherson, and Atkinson all testified that Holland was in possession of a gun at the Andover Street house and pointed his gun at Brown while Brown was against the door and subsequently tied up. *See* Tr., Vol. 3 at 23, 26, 33, 53-55, 148.

- Atkinson testified that while Holland held Brown at gunpoint, Holland warned Brown several times not to move. *Id*. at 152.

- Williams and Holland escorted Brown, who was still restrained, out the back door of the Andover Street house and into the SUV. *Id*. at 153. Holland went with Williams, who drove the vehicle, and Brown.

- Walker testified that Williams and Holland returned to his house around midnight and he observed Brown and Holland seated in the SUV. *See* Tr., Vol. 2 at 196. Williams told Walker "they had a lick set up to get Mr. Brown out of town." *Id*. at 197. Walker testified his SUV was in good condition when Holland, Williams, and Brown left, but it was returned damaged and covered in mud. *Id*. at 197-200.

- Erwin testified that Williams and Holland returned to the Walnut Street house around 1:30 a.m. on February 14. He stated, "[Holland] was more calm and, like, any other day or night, and [Williams] was, you know a

little erratic. . . . He was a little hyped up, like, upset." Tr., Vol. 3 at 84. Williams had the Tech 9 with him and asked Erwin to "take a look at it and clean it and check it out." *Id*. at 86.

- Phillips testified that Holland confessed to her the following: he and Williams went to a house on the north side of town; Williams ordered "three white junkies" to tie Brown up; and he and Williams put Brown in the SUV. *Id*. at 176. Phillips also testified that she had previously told police that Holland had told her Williams shot and killed Brown. *See id*. at 178.

- Officer O'Dell testified that Phillips told him that Holland admitted to her that he was present when Williams shot Brown and that the incident "f\*\*ked with his mind[.]" *Id*. at 191.

- Cell phone records and analysis revealed that on February 14 between 12:19 a.m. and 12:49 a.m., Holland was in the general vicinity of the Andover Street house; between 12:59 a.m. and 1:25 a.m. Holland moved toward the general area of Greenlee's property; between 1:32 a.m. and 2:25 a.m. Holland moved toward the Walnut Street house. *See* Exhibits, Vol. 5 at 38-45.

[20] Given the ample evidence in the record of Holland's involvement in the crime, as demonstrated above, Holland's statements to law enforcement were merely cumulative and even erroneous admission of the statements would not be reversible error. *McVey*, 863 N.E.2d at 440; *see also Wright v. State*, 766 N.E.2d

1223, 1232 (Ind. Ct. App. 2002) (finding the admission of cumulative evidence in the form of defendant's statement to police to be harmless error).

## II. Double Jeopardy

Holland argues the trial court erred by declining to vacate his conviction for murder with the underlying kidnapping felony charge (Count 1) rather than his Level 3 felony conviction for aiding, inducing, or causing criminal confinement (Count 2) due to double jeopardy concerns. Specifically, he maintains that "Count 2 was the more serious offense than the underlying kidnapping charge [in Count 1 which] negated the underlying felony for the conviction on Count 1" and therefore, Count 1 should have been vacated. Appellant's Brief at 18. We disagree.

Whether convictions violate double jeopardy is a question of law which we review de novo. *Grabarczyk v. State*, 772 N.E.2d 428, 432 (Ind. Ct. App. 2002). Article 1, section 14 of the Indiana Constitution provides, "No person shall be put in jeopardy twice for the same offense." "Indiana's Double Jeopardy Clause . . . prevent[s] the State from being able to proceed against a person twice for the same criminal transgression." *Howell v. State*, 97 N.E.3d 253, 263 (Ind. Ct. App. 2018) (quotation omitted), *trans. denied*. As our supreme court has explained, "two or more offenses are the 'same offense' . . . if, with respect to *either* the statutory elements of the challenged crimes *or* the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Richardson v. State*, 717

N.E.2d 32, 49 (Ind. 1999) (emphasis in original). When both convictions cannot stand, the conviction with the less severe penal consequences should be vacated. *Id*. at 55.

[23] Here, the trial court stated the actual evidence presented at trial could establish the elements of kidnapping[5] *and* criminal confinement[6]:

> The acts of holding the victim at gunpoint, tying his hands behind his back, placing the victim in a car and driving him out into the country where he was taken out of the car, before being shot to death by [Holland's] accomplice, are the predicate facts of the underlying felony, kidnapping, supporting the Felony Murder conviction. In this case, there is more than a reasonable possibility that the evidentiary facts used to establish the essential elements of kidnapping, in the Felony Murder, Count 1, may also have been used to establish the essential elements of "confining" of the challenged offense, Count 2, Confinement. Therefore, the two (2) counts merge for sentencing purposes.

Appellant's App., Vol. 3 at 89.

[24] Because there was a reasonable possibility the same evidence established the elements of kidnapping, the predicate felony proving felony murder, and also established the elements of criminal confinement, the trial court correctly

---

[5] "A person who knowingly or intentionally removes another person, by fraud, enticement, force, or threat of force, from one place to another commits kidnapping." Ind. Code § 35-42-3-2(a) (2014).

[6] "A person who knowingly or intentionally confines another person without the other person's consent commits criminal confinement. . . . [The offense is] a Level 3 felony if it . . . is committed while armed with a deadly weapon; . . . results in serious bodily injury to a person other than the confining person[.]" Ind. Code § 35-42-3-3(a), (b)(2)(A), (B) (2014).

declined to enter judgment of conviction and sentence on both felony murder and criminal confinement.[7] Holland appears to argue that because kidnapping, the predicate felony supporting his felony murder conviction, carries a less severe consequence than his criminal confinement conviction, his murder conviction should have been vacated. However, Holland was convicted of felony murder and criminal confinement, *not* kidnapping and criminal confinement. Therefore, the trial court had to determine, as between felony murder and criminal confinement, which conviction should be vacated to avoid a double jeopardy violation. When two convictions cannot stand, the lesser conviction, that is "the conviction with the less severe penal consequences[,]" should be vacated. *Richardson*, 717 N.E.2d at 55. There is no question that Holland's criminal confinement conviction carries a lesser sentence, a sixteen year maximum sentence, than his felony murder conviction, which carries a sixty-five year maximum sentence. *See* Ind. Code § 35-50-2-5(b); Ind. Code § 35-50-2-3(a). As such, the trial court properly vacated Holland's criminal confinement conviction – the lesser conviction – due to double jeopardy concerns. Accordingly, we find no error.

---

[7] In its appellate brief, the State maintains the trial court did not err in vacating Count 2 rather than Count 1 and thus, implicitly concedes there is a double jeopardy issue.

# Conclusion

For the reasons set forth above, we conclude Holland's statements were merely cumulative of other properly admitted evidence at trial, the admission of which was harmless and does not constitute reversible error. We also conclude that the trial court properly vacated Holland's lesser conviction of criminal confinement rather than his felony murder conviction due to double jeopardy concerns. Accordingly, we affirm.

Affirmed.

Mathias, J., and Pyle, J., concur.